### 10061.   GREEN v. THE STATE.

1. When considered in connection with the entire charge of the court there is no material error in any of the instructions of which complaint is made in the motion for a new trial.
2. If there was a theory of the case upon which the judge might have charged on involuntary manslaughter in the commission of a lawful act without due caution and circumspection, it was raised solely by the defendant's statement at the trial.   There was no request to charge on such a theory, and the judge did not err in failing to charge thereon.   That part of the opinion in Warnack v. State, 3 Ga. App. 590 (2), 595 (60 S. E. 288), relied upon by plaintiff in error, as authority requiring the judge in murder cases to charge on the various grades of homicide, upon a theory raised by the defendant's statement only, was expressly declared, in Lott v. State, 18 Ga. App. 747 (3), 748 (90 S. E. 727), to be obiter, and not binding as authority.   An examination of all the cases which apparently hold that it is the duty of the judge to charge on a theory raised only by the statement of the defendant will reveal the fact that there was in each case, in addition to the statement, evidence authorizing the charge, or the attention of the court was expressly called to the statement and a request made in reference thereto.
3. This case is controlled by the case of Clonts v. State, 18 Ga. App. 707, (90 S. E. 373), and the verdict of involuntary manslaughter in the commission of an unlawful act was proper.

>                   DECIDED NOVEMBER 1, 1918.

Conviction of involuntary manslaughter; from Emanuel superior court—Judge Hardeman.   July 26, 1918.

Williams & Bradley, for plaintiff in error.

Walter F. Grey, solicitor-general, contra.

BLOODWORTH, J.   Jim Green was indicted for murder and was convicted of involuntary manslaughter in the commission of an

unlawful act. The evidence shows that a few nights before the homicide the defendant's grandfather, "Uncle Jim Green," who owned the gun with which the deceased—Tom Love Hill—was killed, was aroused by his granddaughter, who stated "that there was somebody coming in the yard," and he jumped up, grabbed the gun, and inserted a shell. When he made an examination of his premises he brought the gun back and put it down at the head of his bed, neglected to remove the shell, and probably left the gun cocked. It was his custom to keep the gun unloaded, and the defendant knew of this custom and did not know that the shell was left in the gun. It was in evidence that Emma Green was dead, and that at the commitment trial she swore that she was in the house when the deceased, the defendant, and one Will Walker went in the house, and that the deceased said, "Jim, let me see your gun," and they went into the room, and "it looked about the time they had time to walk to the gun the gun went off." It was undisputed that several persons stopped at the home of "Uncle Jim Green," where the defendant lived, and were eating mulberries; that the defendant took the hats of the boys and told them each one owed him a dime, and carried the hats away; that there was no quarrel or any feeling between the defendant and the deceased, and that when the visitors were about to leave, Will Walker, the deceased, and the defendant went into the house to get the hats. As to what occurred in the house, Will Walker testified: "We went in the house to get the hats, Me and Love Hill [deceased] and Jim [defendant]. . . Love and Jim were not talking about a shotgun or whether it unbreached on the side or on top. There hadn't been a word said about a gun. If that had been said I would have heard it. I swear positively it wasn't said anything about that. Jim and Love went in the house all friendly; there was no words or trouble. And Jim picked up the gun and just pointed it at Love. . . He went in the house ahead of us, and he went right there and picked up the gun from behind the head of the bed, and he came out there laughing with it in his hand. The gun did not fire right then. . . Love said, 'Don't prank with the gun.' He says, 'You want your hats, don't you?' And Love says, 'Yes.' And he just up with the gun and shot him. This is the way he brought it up. He just brought it up this way and shot it. As to whether he brought it up to his shoulder, he

just brough it up and shot it about along here (indicating to his side). He just brought it up like that. I didn't see him pull the trigger, I couldn't tell whether he pulled the trigger or not. When he brought it up to·his breast the gun fired. He walked out from the head of the bed with the gun down, just this way, and laughed. He was laughing; and Love told him not to prank with him with the gun, and he says, 'You want your hat, don't you?' And Love said, 'Yes.' And he just up with the gun that way and shot him. He was laughing all the time until it fired, I can't be mistaken about that."

The defendant, in his statement at the trial, said: "I went in the house and picked up the gun. Me and him was talking about looking at the gun, and I picked up the gun and went to hand it to him, and the gun fired off, and he run out of the house at the back door and fell out the doorstep, and I run out behind him and jumped down on him to see· was he shot. And he run out under the mulberry tree, and I run down in the field where my grandpa was, and told him I had shot him."

It is not necessary to add anything further to what is said in the headnotes.

*Judgment affirmed. Broyles, P. J., and Harwell, J., concur.*